```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      United States of America,

 4                      Plaintiff,        Case No. 18-30448
           -v-
 5
        Juan Garcia-Jimenez,
 6
                        Defendant.
 7      _____/

 8                      PRELIMINARY EXAMINATION

 9            BEFORE THE HONORABLE MONA K. MAJZOUB
             United States District Magistrate Judge
10      Theodore Levin United States District Courthouse
                     231 West Lafayette Boulevard
11                        Detroit, Michigan
                         September 24, 2018
12

13      APPEARANCES:

14      FOR THE PLAINTIFF:    TIMOTHY McDONALD
                              United States Attorney's Office
15                            211 West Fort Street, Suite 2001
                              Detroit, Michigan  48226
16
        FOR THE DEFENDANT:    RHONDA BRAZILE
17                            Federal Defender Office
                              613 Abbott Street, Fifth Floor
18                            Detroit, Michigan  48226

19

20

21

22
        RECORDED BY:          (Not Identified)
23
        TRANSCRIBED BY:       Rene Twedt - www.transcriptorders.com
24
                  (Transcriber not present at live proceedings.
25                 Transcript produced from digital recording.)
```

1                              TABLE OF CONTENTS

2       MATTER _____   PAGE

3       WITNESSES:

4       MICHAEL GOLOWEYCO
        Direct Examination By Mr. McDonald........................    5
5       Cross Examination By Ms. Brazile..........................   24
        Redirect Examination By Mr. McDonald......................   29
6

7       Argument by Mr. McDonald..................................   30
        Argument by Ms. Brazile...................................   32
8       Further Argument by Mr. McDonald.........................   34
        Further Argument by Ms. Brazile..........................   35
9       Ruling by the Court......................................   36

10


11      EXHIBITS RECEIVED:

12      Government's Exhibit Number 1............................   10
        Government's Exhibit Number 2............................   11
13      Government's Exhibit Number 3............................   12
        Government's Exhibit Number 4............................   17
14      Government's Exhibit Number 5............................   20

15


16      CERTIFICATE OF TRANSCRIBER...............................   37

17

18

19

20

21

22

23

24

25

1   Detroit, Michigan

2   October 15, 2018

3   1:19 a.m.

4                          *      *      *

5           THE CLERK:  Court calls Case Number 18-30448, United

6   States of America versus Juan Garcia-Jimenez.

7           MR. McDONALD:  Again, Tim McDonald on behalf of the

8   United States.  Good afternoon again, your Honor.

9           THE COURT:  Good afternoon.  And thank you.

10          MS. BRAZILE:  Good afternoon, your Honor.  Rhonda

11  Brazile of the Federal Defender Office on behalf of Mr. Juan

12  Garcia-Jimenez.

13          THE COURT:  Thank you, Ms. Brazile.

14          Will the defendant state his name to the Court,

15  please?

16          THE DEFENDANT:  Juan Antonio Garcia-Jimenez.

17          THE COURT:  Mr. Garcia-Jimenez, today is the date and

18  time set for a preliminary examination.  Do you require or

19  need the assistance of an interpreter?

20          THE DEFENDANT:  No, your Honor.

21          THE COURT:  All right.  Very well.  Are the -- is

22  counsel prepared to proceed?

23          MR. McDONALD:  Yes, your Honor.

24          MS. BRAZILE:  Yes, your Honor.

25          THE COURT:  Very well.  Mr. McDonald?

```
 1              MR. McDONALD:  Your Honor, may I approach?  I have
 2   handed counsel five photographs that I intend to admit during
 3   the preliminary exam.
 4              Your Honor, I have one witness.  When the Court is
 5   prepared, I am prepared to call that witness.
 6              THE COURT:  Very well.
 7              MR. McDONALD:  United States calls Michael Goloweyco
 8   of the United States Border Patrol.
 9              THE COURT:  Good afternoon.
10              THE WITNESS:  Good afternoon, your Honor.
11              THE COURT:  Please raise your right hand.
12                         *      *      *
13                      MICHAEL GOLOWEYCO
14                 was called as a witness, after having
15                 been duly sworn to testify to the truth.
16                         *      *      *
17              THE COURT:  Please state your name and spell it for
18   the record.
19              THE WITNESS:  Michael Goloweyco.  M-I-C-H-A-E-L.
20   M-I-C-H-A-E-L, G-O-L-O-W-E-Y-C-O.
21              THE COURT:  If you will have -- be seated at the
22   witness table, and speak into the microphone clearly and
23   slowly when you are asked questions.
24              Mr. McDonald, would you like to proceed?
25              MR. McDONALD:  Thank you, your Honor.
```

```
 1                      DIRECT EXAMINATION
 2   BY MR. McDONALD:
 3   Q.   Sir, where are you employed?
 4   A.   I'm employed for the United States Border Patrol.
 5   Q.   All right.  And for how long have you been employed with
 6   the United States Border Patrol?
 7   A.   A little over nine years.
 8   Q.   All right.  And can you tell us briefly what your duties
 9   are with the United States Border Patrol?
10   A.   I work in our Intelligence Department.  I investigate
11   smuggling, cross-border activity, and other crimes within the
12   city.
13   Q.   Okay.  And when you say "the city" you mean the City of
14   Detroit, Michigan?
15   A.   Yes, sir.
16   Q.   All right.  I want to ask you about an investigation
17   involving a subject by the name of Juan Antonio Garcia-Jimenez.
18   Are you familiar with that investigation?
19   A.   I am, sir.
20   Q.   And can you tell -- can you tell us what the nature of the
21   investigation is?
22   A.   We had several cross-border events.
23   Q.   Who is "we"?
24   A.   The United States Border Patrol has had several smuggling
25   events through the CBP cargo tunnel or train tunnel within the
```

1    City of Detroit.

2    Q.   Okay.  And what -- you said you have had several smuggling

3    events.  When did those smuggling events begin?

4    A.   They began in March of 2018.

5    Q.   Okay.  And now, this is a -- this investigation, is this

6    the United States Border Patrol and any other law enforcement

7    agencies?

8    A.   Yes.  We're also co-investigating with the Royal Canadian

9    Mounted Police.

10   Q.   Okay.  And you said since March you had a number of

11   incidents.  How many aliens were smuggled from March of 2018

12   until present day?

13   A.   We have a total of nine aliens.

14   Q.   Okay.  And you said through a cargo tunnel.  Are you

15   familiar with something called the Michigan-Canadian Railroad

16   Tunnel?

17   A.   Yes, sir.

18   Q.   All right.  And can you just describe that for us?

19   A.   It is a -- about a mile and a half long.  It runs between

20   Windsor, Ontario and Detroit, Michigan.  It's for trains only,

21   typically for cargo trains.

22   Q.   Okay.  And that's in the Eastern District of Michigan?

23   A.   Yes, sir.

24   Q.   Now, drawing your attention to March of 2018, that was the

25   first incident?

Preliminary Hearing - October 15, 2018

```
 1   A.   That we know of, yes.
 2   Q.   All right.  And do you know how many aliens were -- were
 3   smuggled through that tunnel in March?
 4   A.   It was one Mexican national.
 5   Q.   All right.  And as result of your investigation into that
 6   March smuggling incident, were you able to obtain a phone
 7   number of the smuggler?
 8   A.   Yes, we were.
 9   Q.   And how were -- how did you obtain that phone number?
10   A.   The -- the illegal alien gave us the phone number.
11   Q.   Okay.  And on the basis of that number, what -- what, if
12   anything, did you do with it?
13   A.   We were able to run that number through our CBP databases
14   and essentially our -- the defendant had applied for a Nexus
15   card using that phone number.
16   Q.   Okay.  Well, we will get to the defendant in a second, but
17   you said this -- you had a phone number and you looked through
18   your databases; correct?
19   A.   Correct.
20   Q.   Were you able to obtain a photograph of an individual who
21   had used that number in the past?
22   A.   We were.
23   Q.   All right.  And did you look at that photograph?
24   A.   We did.
25   Q.   Do you see anyone that -- in the courtroom that -- that
```

1    looks like the person depicted in that photograph?

2    A.   I do.

3    Q.   All right.  And can you point to that person and tell me

4    an article of clothing that person is wearing?

5    A.   It's going to be the gentleman sitting down with the blue

6    suit on.

7         MS. BRAZILE:  Okay.  Your Honor, we don't have this

8    photograph that the agent is referring to or that the

9    government is referring to in making the comparison.  I object

10   to that identification without the photograph.

11        MR. McDONALD:  Well, Judge, I mean, he made an

12   in-court identification based upon his review of a prior

13   photograph.  I don't know that there is any legal basis to

14   object to that.

15        THE COURT:  Do you want to establish the defendant's

16   identity through any other means, including any of your

17   exhibits?

18        MR. McDONALD:  I will.  I will as we go.  Maybe I'll

19   reserve the identification, if the Court permits.

20        THE COURT:  I think we will do that.  Thank you.

21   BY MR. McDONALD:

22   Q.   Okay.  All right.  So, but now let me specifically direct

23   your attention to July 30th of 2018 at 4:00 in the morning.

24        Did the United States Border Patrol have an encounter

25   with some additional aliens?

1    A.   We did.   We encountered two Guatemalan nationals at the --

2    I guess the entrance of the train tunnel in Detroit.

3                 THE COURT:   What was the date again?

4                 MR. McDONALD:   That was July 30th, 2018, your Honor.

5                 THE COURT:   Thank you.

6    BY MR. McDONALD:

7    Q.   All right.   And -- and were those individuals arrested?

8    A.   They were.

9    Q.   What were they arrested for?

10   A.   Illegal entry into the United States.

11   Q.   All right.   And were you able to identify the citizenship

12   and immigration status of these two individuals?

13   A.   Yes, we were.

14                MR. McDONALD:   All right.   May I approach the

15    witness?

16                THE COURT:   You may.

17   BY MR. McDONALD:

18   Q.   Sir, I'm handing you what's been marked as Exhibit

19   Number 1.   Can you identify it for the record?

20   A.   Yes.

21   Q.   What is it?

22   A.   That's going to be the entrance to the train tunnel on the

23   Windsor side.

24   Q.   Okay.   That's a photograph of the entrance?

25   A.   No.   That's going to be a still of the video we have of

1    the aliens entering the tunnel.

2    Q.   Okay.  And where did you get the still?

3    A.   Through our Canadian Pacific Railroad Police.

4            MR. McDONALD:  Okay.  Move for admission of Exhibit

5    Number 1, your Honor.

6            THE COURT:  Any -- any objection?

7            MS. BRAZILE:  No, your Honor.

8            THE COURT:  Exhibit 1 is admitted.

9        (Received in Evidence:  Exhibit Number 1.)

10   BY MR. McDONALD:

11   Q.   All right.  And is that the -- you said that is the

12   Canadian side?

13   A.   Correct.

14   Q.   All right.  Showing you -- do you see any individuals in

15   Exhibit 1?

16   A.   Yes.  I see two individuals.

17   Q.   And were these the two individuals that you arrested on

18   the 30th of July at 4:00 in the morning?

19   A.   They were, yes.

20   Q.   Showing you what's been marked as Government's Exhibit

21   Number 2, do you recognize what that is?

22   A.   Yes.  That's the exit of the train tunnel on the Detroit

23   side.

24   Q.   And does that still accurately reflect what was depicted

25   in the video that you received?

1   A.   Yes, sir.

2           MR. McDONALD:  Move for admission of 2.

3           THE COURT:  Ms. Brazile?

4           MS. BRAZILE:  No objection, your Honor.

5           THE COURT:  Exhibit 2 is admitted.

6       (Received in Evidence:  Exhibit Number 2.)

7           MR. McDONALD:  Thank you.

8   BY MR. McDONALD:

9   Q.   Do you see two individuals coming out of the tunnel in

10  that photograph?

11  A.   Yes, I do.

12  Q.   Is that the same two individuals that went in, in Exhibit

13  Number 1?

14  A.   Correct.  Yes, sir.

15  Q.   And are those two individuals the two individuals you

16  arrested on the 30th of July?

17  A.   That is.  They are.

18  Q.   All right.  Also showing you Government's Exhibit 3, do

19  you recognize what that is?

20  A.   Yes.  It's also the entrance on the Windsor side.

21  Q.   Okay.  And does that accurately depict the stills of the

22  video?

23  A.   Yes, sir.

24          MR. McDONALD:  I move for admission of 3.

25          THE COURT:  Ms. Brazile?

1        MS. BRAZILE:  No objection, your Honor.

2        THE COURT:  Exhibit 3 is admitted.

3     (Received in Evidence:  Exhibit Number 3.)

4        MR. McDONALD:  Thank you.

5  BY MR. McDONALD:

6  Q.  Are any of the individuals in the photograph depicted --

7  or excuse me.

8        Any individuals that you arrested, are they depicted

9  in that photograph?

10  A.  Yes.

11  Q.  Where are they depicted?

12  A.  They are up on the -- I guess the walkway of the tunnel.

13  Q.  Okay.  Now, did you have an opportunity at some point

14  after arresting these two individuals to interview them?

15  A.  I did interview them, yes.

16  Q.  All right.  And can you tell the Court what, if anything,

17  they told you?

18  A.  They described the events leading up to the -- the

19  smuggling event and then also the smuggling event itself.

20        They essentially were both legal farm workers in

21  Canada.  Their -- both their visas were about to expire or

22  possibly expired already in Canada and they both wanted to

23  come to the United States to continue working.

24  Q.  All right.  And so how -- did they tell you how it was

25  that they began to try to find someone to assist them?

1    A.   In the Leamington, Ontario area they started asking around

2    some of the other farm workers, and if they knew anybody that

3    could get them into the United States.

4    Q.   All right.  And then what?  What did they tell you?

5    A.   And then they said that they received Mr. Garcia's phone

6    number from a friend.

7    Q.   Okay.  Was that -- now, was that the same phone number, by

8    the way, that you received from the first alien in March?

9    A.   Yes, sir.

10   Q.   Okay.  And that phone number came back to Mr. Garcia?

11   A.   Yes, sir.

12   Q.   Okay.  And -- all right.  So they indicate that they get

13   the phone number.  Do they talk about making contact with --

14   with this subject?

15   A.   Yes, sir.  They said they used the WhatsApp application on

16   their phones in order to contact him.

17   Q.   All right.  And did they refer to the person they were

18   talking to by any nickname?

19   A.   Yeah.  I believe they used Tralo -- Tralero.

20   Q.   Tralero?

21   A.   Tralero.

22   Q.   What about Antonio, did they ever use that name?

23   A.   I don't know -- I don't believe that group used Antonio.

24   Possibly Tono.

25   Q.   Okay.  Tono?

1    A.   Tono, yes.

2    Q.   All right.  And did they tell you if they made any

3    arrangements with Tono to be smuggled into the United States?

4    A.   Yes, they did.  We had it documented on the WhatsApp

5    conversation.

6    Q.   What do you mean?

7    A.   So the -- we took screenshots of all of the -- both aliens

8    allowed us to look through their phones and so we took

9    screenshots of both conversations with Mr. Garcia and/or Tono

10   and it was basically the facilitation of their entry into the

11   United States.

12   Q.   Okay.  Was that in English or in Spanish?

13   A.   It was in the Spanish language.

14   Q.   Okay.  What were the arrangements?

15   A.   The arrangements were that the subject would -- would pick

16   up both subjects in Leamington area, drive them over to the

17   Windsor area.

18          THE COURT:  Wait, wait, wait.  The subject, you mean

19    the defendant?

20          THE WITNESS:  The defendant.

21          THE COURT:  Would pick up both subjects?

22          THE WITNESS:  Would pick up both subjects in

23    Leamington, Ontario, at the farm where they were working at,

24    and drive them to the Windsor area.

25          Both subjects were told they needed to pay $1,500 a

1    piece.

2    BY MR. McDONALD:

3    Q.   To who?

4    A.   To Mr. Garcia.

5    Q.   Okay.

6    A.   In order to be driven over to the Windsor area and then

7    taken to the tunnel itself.

8    Q.   All right.  And according to the aliens, were they, in

9    fact, picked up in Leamington?

10   A.   They were picked up in Leamington, yes.

11   Q.   And according to the aliens, were they, in fact,

12   transported to Windsor?

13   A.   Yes, they were.

14   Q.   And did the aliens tell you who transported them and how

15   to Windsor?

16   A.   Yes.  They -- they told us that it was -- that it was

17   Don Antonio or Tonio that picked them up.

18   Q.   Okay.  The person who you told us is the defendant?

19   A.   Correct.

20   Q.   Okay.  And so when they get to Windsor what, if anything,

21   happens, do you know?

22   A.   They get to Windsor.  I believe it was at about -- they

23   got into Windsor at about 11:00, and he requested that they --

24   Q.   Who is "he"?  Who is "he"?

25   A.   The defendant requested that they change over their money

1    from Canadian to U.S. dollars.

2    Q.   All right.  And so did they do that?

3    A.   They did.  So they went to the Windsor casino and

4    exchanged all their money, their Canadian money over for U.S.

5    dollars.

6              MR. McDONALD:  Okay.  May I approach the witness?

7              THE COURT:  You may.

8    BY MR. McDONALD:

9    Q.   Sir, I'm showing you what's been marked as Government

10   Exhibit Number 4.  Can you identify what that is?

11   A.   Yes.  This is the defendant at the cashier's stand with --

12             MS. BRAZILE:  Excuse me, your Honor.  My exhibits are

13    not marked.

14             Which one are you referring to?

15             MR. McDONALD:  Oh, I'm sorry.

16   BY MR. McDONALD:

17   Q.   All right.  You said it shows what?

18   A.   That is the defendant at the cashier counter in the

19   Windsor casino with both of the Guatemalan nationals.

20   Q.   All right.  And how did you obtain images from the

21   Caesar's or the Windsor casino?

22   A.   It was through our Canadian liaison, was able to contact

23   the Windsor casino and get it through Ontario Provincial

24   Police.

25   Q.   Okay.  So the video?

Preliminary Hearing - October 15, 2018

```
 1   A.   Yes, sir.

 2   Q.   And did you watch the video?

 3   A.   I did.

 4   Q.   And does that still of the video accurately and fairly

 5   depict the video itself?

 6   A.   Yes, sir.

 7   Q.   And do you see -- strike that.

 8            MR. McDONALD:  Your Honor, move for admission of

 9   Government Exhibit Number 4.

10            THE COURT:  Any objection, Ms. Brazile?

11            MS. BRAZILE:  No, your Honor.

12            THE COURT:  Exhibit 4 is admitted.

13       (Received in Evidence:  Exhibit Number 4.)

14            MR. McDONALD:  Thank you.

15   BY MR. McDONALD:

16   Q.   And Exhibit 4, you said that there is a -- how many

17   subjects are in that photograph?

18   A.   Three subjects.

19   Q.   And do you recognize all three of them?

20   A.   I do.

21   Q.   And can you describe where and who they are?

22   A.   Yes, I can.

23   Q.   Okay.

24   A.   Okay.  So the defendant is going to be on the left-hand

25   side.  Both of our Guatemalan nationals did not speak any
```

1    English, so he had to do all the trans -- the defendant had to

2    do all the translating for them at the cashier counter.  The

3    other one is, I believe, Carpio Recinos and then Corado

4    Recinos.  Both were cousins.

5    Q.   Those two individuals that you just identified, Carpio and

6    Corado, were those the two individuals that were arrested on

7    the Detroit side?

8    A.   Yes, sir, they were.

9    Q.   And the other person who you claim is the defendant, can

10   you identify what he is wearing?

11   A.   Yes, sir.  He is --

12   Q.   What's he wearing?

13   A.   He is wearing a -- looks like to be a button-down plaid

14   shirt.

15   Q.   Okay.  And the person depicted in that photograph that you

16   have identified as the defendant, do you see that person in the

17   courtroom?

18   A.   Yes, sir.

19   Q.   All right.  Can you point to that person and identify what

20   he is wearing today?

21   A.   Yes, sir.  He is sitting right there in front of me with

22   the blue jumpsuit, orange flip-flops.

23           MR. McDONALD:  Your Honor, at this time let the

24    record reflect that the witness has identified the defendant.

25           THE COURT:  I'm sure it will reflect that.

```
 1              MR. McDONALD:  Thank you.
 2   BY MR. McDONALD:
 3   Q.  All right.  So the aliens had told you, you correct me if
 4   I'm wrong, that they had to go Caesar's casino -- or a casino,
 5   excuse me -- to transfer, exchange their money?
 6   A.  Correct.
 7   Q.  After they do that, what did they tell you happened?
 8   A.  They stated they left the casino together, all three of
 9   them, and the video does corroborate that.  It shows them
10   walking out towards -- I believe it's Riverside Drive there,
11   and they all headed towards the entrance of the train tunnel
12   in the Windsor area.
13              MR. McDONALD:  May I approach the witness again?
14              THE COURT:  Yes, you may.
15   BY MR. McDONALD:
16   Q.  I'm showing you Government's Exhibit Number 5.  Do you
17   recognize what that is?
18   A.  Yes, sir.
19   Q.  Can you identify it for the record?
20   A.  Yes.  It's going to be the three individuals walking
21   together in the casino.
22   Q.  Okay.  And where did you obtain that image?
23   A.  That was through the video that we obtained through
24   Canada.
25   Q.  Does that fairly and accurately depict what you saw on the
```

1    video?

2    A.   Yes, sir.

3           MR. McDONALD:  Move for the admission of 5.

4           THE COURT:  Any objection, Ms. Brazile?

5           MS. BRAZILE:  No objection, your Honor.

6           THE COURT:  Exhibit 5 is admitted.

7       (Received in Evidence:  Exhibit Number 5.)

8    BY MR. McDONALD:

9    Q.   Okay.  So after walking through the casino did the aliens

10   tell you what they did with the defendant?

11   A.   Yes.  They headed back to his van and then at that time

12   headed over to the entrance of the -- of the train tunnel or a

13   parking lot near it.

14   Q.   Okay.  And what happens next?

15   A.   They sat there and they waited for a train to come.

16   Q.   Okay.  Does there come a point when the defendant tells

17   the aliens that it's time for them to go through the train

18   tunnel?

19   A.   Yes.  So typically the train comes at about the 1:00 a.m.

20   to 1:30 mark, but that night the train must have been late or

21   did not arrive.  So at about 3:00, 3:15 in the morning, he told

22   them -- the defendant told the aliens to just go and make their

23   way through the tunnel.

24   Q.   Okay.  And what about arrangements once the aliens entered

25   the United States, was there any discussion of that?

1    A.   Yes.  The defendant told both aliens that there would be a

2    white truck waiting for them at the Green Dot Stables, if not

3    him himself.

4    Q.   And based on your knowledge and investigation, what is the

5    Green Dot Stables?

6    A.   It is a restaurant in the southwest Detroit area.

7    Q.   Okay.  Now, does there come a point in time when you're

8    interviewing these two aliens where you ask if they can

9    identify the smuggler?

10   A.   Yes.

11   Q.   Okay.  And can you tell us about that a little bit?

12   A.   Sure.  So I believe at the time we -- we had just happened

13   to -- we pulled a couple pictures that we had some possible

14   smugglers within the United States -- or within the Canada

15   area, and we showed them a picture.  We asked them if that

16   person looked familiar, which the picture was of the defendant.

17            MS. BRAZILE:  Your Honor, again, I don't have this

18   picture.  If this was a photo array lineup, we don't have any

19   comparison as to what he is referring to --

20            THE COURT:  I don't even know --

21            MS. BRAZILE:  -- as far as identification.

22            THE COURT:  -- to whom you are referring.

23            THE WITNESS:  To the defendant.  About the defendant.

24            THE COURT:  All right.  Can we start over with this?

25   It's a little jumbled.

```
 1              MR. McDONALD:  Sure.
 2    BY MR. McDONALD:
 3    Q.  At some point during your interview of the illegal aliens
 4    that you arrested on July 30th in the morning --
 5    A.  Yes.
 6    Q.  -- did you show them any photographs?
 7    A.  We did.
 8              MS. BRAZILE:  Again, this is --
 9              THE COURT:  Wait.  Let him continue.
10              MS. BRAZILE:  Okay.
11    BY MR. McDONALD:
12    Q.  And what photograph did you show the aliens?
13    A.  We showed a photograph of Mr. Garcia.
14    Q.  Okay.  And when you showed the photograph to Mr. Garcia,
15    what, if anything, did you -- did you ask them or tell them?
16    A.  We just asked them, does this person look familiar to you.
17    Q.  Okay.  And you did that each -- to each individual?
18    A.  Yes, we did.
19    Q.  Okay.  And what did they say?
20    A.  They positively ID'ed the defendant as 100 percent certain
21    that that was who brought them to the train tunnel.
22    Q.  Okay.  Now, let me ask you a little bit about this -- this
23    phone number.
24              You previously testified that you had been able to
25    obtain a phone number in March and that when you arrested these
```

1   two aliens you found the same phone number in -- with the

2   aliens?

3   A.   Right.

4   Q.   Do you know when the defendant was actually arrested?

5   A.   It was on August 29th.

6   Q.   Okay.  And that's when he is coming into the United

7   States; is that right?

8   A.   Correct.

9   Q.   And in the course of that arrest did the defendant give

10  you any phone number that -- that is associated with him

11  himself?

12  A.   Yes, sir.

13  Q.   And was that the same or a different phone number than

14  given to you by the alien in March and given to you by the two

15  aliens in July?

16  A.   It was the same phone number.

17          MR. McDONALD:  May I have just one second, your

18  Honor?

19          THE COURT:  You may.

20     (Pause in the proceedings at 1:41 p.m.)

21          MR. McDONALD:  I don't have any further questions.

22          THE COURT:  Thank you.

23          Ms. Brazile, would you like to cross examine this

24  witness?

25          MS. BRAZILE:  Yes, your Honor.

```
 1                          CROSS EXAMINATION
 2   BY MS. BRAZILE:
 3   Q.   Agent Goloweyco?
 4   A.   Yes, ma'am.
 5   Q.   From your testimony you identified Government's Exhibit 4?
 6   A.   Yes, ma'am.
 7   Q.   And Government's Exhibit 5?
 8   A.   Yes, ma'am.
 9   Q.   Do you see it from here?
10   A.   Uh-huh.
11   Q.   As being the two nationals that are the same ones that are
12   in Government's Exhibit 1 -- sorry -- 1, 2 -- you have it in
13   front of you --
14   A.   Yes, ma'am.
15   Q.   -- and 3?
16   A.   Yes, ma'am.
17   Q.   Is that correct?
18   A.   That is correct.
19   Q.   And from your testimony, you say that Government's
20   Exhibit 4, supposedly there was a conversation that the subject
21   in the photo supposedly translated for the Guatemalan nationals
22   in the photo?
23   A.   Yes.
24   Q.   Because they could not speak English?
25   A.   Correct.
```

1    Q.   Do you have audio of this conversation?

2    A.   I do not.

3    Q.   Did you have any recording at all of any conversation

4    between the nationals and the subject?

5    A.   I do not.

6    Q.   Are you aware, Agent Goloweyco, that Mr. Garcia-Jimenez is

7    a taxi driver --

8    A.   Yes, ma'am.

9    Q.   -- in Canada?

10   A.   Yes, ma'am.

11   Q.   So his number being in the phone of one of the nationals,

12   his number you claim appeared in one of their phones?

13   A.   It appears in both their phones.

14   Q.   Okay.  And he is a taxi driver?

15   A.   He is.

16   Q.   Okay.  Do you have any audio or surveillance of any of the

17   conversations that took place in his taxicab?

18   A.   In his taxicab?

19   Q.   In his vehicle.

20   A.   No, ma'am.

21   Q.   Okay.  You said you do have WhatsApp conversations?

22   A.   Yes, ma'am.

23   Q.   And that is about transporting them?

24   A.   Correct.

25   Q.   And that's in Spanish?

1   A.   Correct.

2   Q.   This casino, is it located in Canada?

3   A.   Yes, ma'am.

4   Q.   Okay.  The conversations that were supposedly taking place

5   but not recorded, did those take place in Canada, as far as you

6   know?

7   A.   Which conversations?

8   Q.   The conversations, any of them.  The ones at the casino,

9   that took place in Canada?

10  A.   Yes.  So in the video you're able to see them talking to

11  each other.

12  Q.   Okay.  And the conversations that you claim occurred,

13  that the nationals claim occurred between the subject and

14  themselves, that took place in Canada prior to any entry into

15  the United States?

16  A.   With the WhatsApp or speaking face-to-face?

17  Q.   Any of them.

18  A.   Yes.

19  Q.   They took place in Canada?

20          THE COURT:  Wait.  Wait.  Hold on.  I don't know what

21  "yes" answers.  What question are you answering?

22          MS. BRAZILE:  Okay.  I'll -- I'll ask him again and

23  we will break them down.

24          THE COURT:  Thank you.

25

1    BY MS. BRAZILE:

2    Q.   The conversations that the Guatemalan nationals claim to

3    have had with the subject --

4              THE COURT:  The defendant.

5    Q.   -- the defendant, the accused, the conversations in his

6    vehicle, did those take place in Canada?

7    A.   Yes.

8    Q.   Okay.  The conversations that the Guatemalan nationals

9    claimed to have had with the defendant on WhatsApp, did that

10   take place in Canada?

11   A.   Yes.

12   Q.   In Government's Exhibit 1, 2, or 3, is there any depiction

13   of the subject defendant accused, Juan Garcia-Jimenez?

14   A.   No, ma'am.

15   Q.   Okay.  In Government's Exhibits 1, 2, or 3, is there any

16   depiction of subject Juan Garcia's vehicle?

17   A.   No, ma'am.

18   Q.   Mr. Juan Garcia-Jimenez was arrested on what date again?

19   A.   I believe August 29th, 2018.

20   Q.   Was there any illegal nationals or foreign nationals with

21   him in his vehicle?

22   A.   No, ma'am.

23   Q.   Okay.  Did he have proper paperwork to come to the United

24   States?

25             MR. McDONALD:  I'm going to object to relevance.

```
 1              THE COURT:  Over -- overruled.
 2   BY MS. BRAZILE:
 3   Q.   Did he?
 4   A.   I believe so.  I believe he had his Canadian passport.
 5   Q.   Okay.  To your knowledge, Agent Goloweyco, did subject
 6   Juan Garcia-Jimenez have any contact at all with these
 7   Guatemalan nationals in the United States?
 8   A.   That, I do not know.
 9   Q.   You can't say one way or the other?
10   A.   No.
11   Q.   You have no information regarding that; right?
12   A.   No.
13   Q.   Do you have any information regarding subject/defendant
14   Juan Garcia-Jimenez having any contact with any of the illegal
15   nationals that were subjects of the investigations since March
16   in the United States?
17              Do you have -- do you need me to ask that again?
18   A.   So after they entered the United States?
19   Q.   Do you have any information --
20   A.   No.  They were all in our custody at that time.
21   Q.   So your investigation didn't lead to anyone that they met
22   here in the United States?
23   A.   No, ma'am.
24              MS. BRAZILE:  I have no further questions, your
25    Honor.
```

1           THE COURT:  Thank you.

2           Mr. McDonald?

3           MR. McDONALD:  Very briefly.

4                         REDIRECT EXAMINATION

5    BY MR. McDONALD:

6    Q.   You said that at one point you looked at the conversations

7    that -- on the WhatsApp messaging service between these two

8    Guatemalans and the defendant?

9    A.   Yes, sir.

10   Q.   And can you tell the Court whether that conversation talks

11   about the payment of money to get across the United States

12   border?

13   A.   Yes, sir, it does.

14   Q.   Okay.  And do you remember specifically what it said?

15   A.    It -- it was quite a -- over a course of several days,

16   they were talking back and forth, but it was the facilitation

17   of their transport to the cargo tunnel and how to get them

18   through.  He also stated within the -- or the defendant also

19   stated in the conversation that there would be someone waiting

20   for them on the other side to pick them up.

21   Q.   Okay.  There was a recent incident with four more illegal

22   aliens; is that right?

23   A.   Yes, sir.

24   Q.   And did any of those aliens or all of those aliens

25   identify the defendant as the individual who assisted them

1   in -- with smuggling to the United States?

2   A.   Yes, they did.

3   Q.   They -- they --

4   A.   Yes.  They -- they indicated that it was the defendant.

5           MR. McDONALD:  Okay.  All right.  Thank you.  I don't

6   have any other questions.

7           THE COURT:  Ms. Brazile, anything further?

8           MS. BRAZILE:  No, your Honor.

9           THE COURT:  Thank you.

10          You may step down.  Thank you.

11          Mr. McDonald?

12          MR. McDONALD:  Your Honor, I have no further

13   witnesses and I -- I rest.  I'm prepared to argue when the

14   Court is ready.

15          THE COURT:  Ms. Brazile, do you care to call

16   witnesses?

17          MS. BRAZILE:  No, your Honor.  I have no witnesses.

18          THE COURT:  All right.  I'm going to let Mr. McDonald

19   argue at this point and then we will turn to you.

20          MR. McDONALD:  Thank you.

21          Your Honor, the defendant is charged under 8 U.S.C.

22   1324 with the encouragement and inducement and inducing the

23   illegal entry into the United States, knowing that coming to

24   or remaining or entering the United States is in violation of

25   the law.

1          To prove that crime, your Honor, the government

2     would have to prove four elements.  One, that the defendant

3     encouraged or induced; two, that the individual he encouraged

4     or induced is an alien; third, that he did so -- he encouraged

5     these aliens to come, enter, or reside in the United States;

6     and the last element is that knowing or in reckless disregard

7     that the aliens coming to, entering, or residing in the United

8     States is illegal.

9          Your Honor, based on the testimony of the Border

10    Patrol agent, there is probable cause to believe that at a

11    minimum, your Honor, he induced two aliens, that is, on

12    July 30th, 2018.  I suggest to the Court that there is

13    probable cause that he encouraged and induced all nine aliens,

14    at least seven of which have been presented to the Court.

15         Your Honor, the crime of inducement can occur without

16    any act occurring in the United States.  That's United States

17    versus Beliard, 618 F.2d 886.  That's a First Circuit Court in

18    1980.  That Court also -- that Court also states that if the

19    government elects to proceed in a case in which no elements of

20    the offense occurred in the United States, then venue must be

21    based on 18 U.S.C. 3238.

22         Your Honor, 18 U.S.C. 3238 talks about offenses not

23    committed in any district, but says that the trial of those

24    offenses committed in another district is appropriate where

25    the defendant or the offender is arrested in.  So the

1    defendant was arrested in the Eastern District of Michigan

2    and, therefore, venue is proper under 18 U.S.C. 3238.

3              Specifically, on July 30th, your Honor, two illegal

4    aliens from Guatemala looking to come to the United States

5    contacted the defendant.  The defendant picked them up in

6    Leamington, Ontario, drove them to Windsor, assisted them in

7    exchanging their money from Canadian into United States

8    dollars, took them to the entrance of the train tunnel at the

9    Windsor -- in Windsor, Canada, and instructed them when to

10   enter the tunnel, waiting for a number of hours until they

11   entered the United States.  The defendant also -- and he did

12   so for money, your Honor, $1,500 per alien.

13             The defendant also, your Honor, instructed the aliens

14   that once they entered the United States there would be an

15   individual or individuals waiting for them at a restaurant in

16   Detroit.

17             Based on the testimony of the Border Patrol agent, we

18   have satisfied, at a minimum, your Honor, by a probable cause

19   standard, and we would ask that you make that finding, that

20   there is probable cause to believe the defendant violated the

21   statute.

22             THE COURT:  Thank you.

23             Ms. Brazile.

24             MS. BRAZILE:  Your Honor, based on the testimony of

25   the agent, it is highly unclear that it is this defendant that

1    smuggled or assisted to smuggle anyone into the United States.

2            First of all, with regard to the alleged

3    conversations that took place between the nationals and

4    Mr. Garcia, there is nothing that connects Mr. Garcia as the

5    person that they claim to be Tralero or Tono.  That particular

6    person used a phone that Mr. Garcia-Jimenez is said to have

7    possessed, however, that doesn't mean that that was -- those

8    conversations were initiated or between Mr. Garcia-Jimenez and

9    those nationals.  That phone was used, but it doesn't mean

10   that Mr. Garcia-Jimenez used that phone to do that.

11           Also, your Honor, there is no conversations that were

12   recorded.  The agent did not present any surveillance on the

13   Canadian side that showed, other than the casino -- which I

14   will get to in a moment -- that showed Mr. Garcia-Jimenez

15   doing the transporting of anyone to a tunnel.

16           Mr. Garcia-Jimenez is a taxi driver.  He takes people

17   to where they ask him to take them.  The conversations that

18   purportedly took place in a casino, again, he is a taxi

19   driver.  He took two Spanish-speaking individuals to a casino

20   in Windsor.  We have no idea the conversation, the extent of

21   the conversation, or what the conversation was about in the

22   casino, other than the testimonies of two individuals who have

23   been caught violating the law.

24           They have a contact in their telephone that, yes,

25   they are familiar with, because he is a taxi driver.  But

 1   there is nothing that indicates that that familiarity made him

 2   that smuggler that they are talking about or had talked to on

 3   the telephone, or I should say, with the WhatsApp application,

 4   which I believe is a texting application on the telephone.

 5   It doesn't mean that that was Mr. Garcia that they were

 6   identifying as Tralero or Tono.

 7          Again, your Honor, it is questionable whether they

 8   have established probable cause at all to say that Mr. Juan

 9   Garcia-Jimenez is the individual that was smuggling them.

10   They have no photograph of his vehicle near this tunnel

11   whatsoever.  They have only the people alleging that they

12   brought them to the tunnel.

13          Mr. Garcia is not seen with any of these individuals,

14   either in the tunnel or after their exit, though that's what

15   they allege, that he would have been over there.

16          Your Honor, I do not believe that the government has

17   fully laid out probable cause to charge Mr. Juan Garcia-Jimenez

18   with the smuggling of the two nationals that are at issue in

19   our questioning or any of the others.

20          Thank you, your Honor.

21          THE COURT:  Thank you.

22          MR. McDONALD:  Your Honor, very briefly, the problem

23   with Ms. Brazile's argument is that it's not supported at all

24   by the evidence.  Rather, the testimony is that the aliens

25   themselves identified the defendant as the person who picked

1    them up in Leamington, Ontario, drove them down to Windsor,

2    went with them to the Caesar's casino to exchange their money,

3    drove them to the tunnel entrance, instructed them on when to

4    enter, and instructed them that there would be an individual

5    waiting for them.  So it's very clear.

6            Moreover, your Honor, there was four aliens.  As the

7    individual -- the Border Patrol agent just testified, there's

8    an additional four aliens recently who testified that the

9    defendant -- or who told Border Patrol that the defendant

10   was the individual who smuggled them.

11           I think we have demonstrated beyond probable cause,

12   your Honor, that this alien has committed this crime.

13           THE COURT:  Anything further, Ms. Brazile?

14           MS. BRAZILE:  Your Honor, I want to make one --

15   I want to put on the record my objection also to the

16   government's establishing of jurisdiction under 18 3238.

17   They listed a case out of the First Circuit that said the

18   jurisdiction could be established.

19           There is no case, I do not believe, in this Circuit,

20   that says anything that ties this particular statute provision

21   to the Illegal Immigration Naturalization Act, 8 U.S.C. 1324.

22   There is no jurisdiction provision that's actually in 1324.

23   And the acts, all of which have been committed in this case,

24   as the agent testified, took place in Canada.

25           And, again, there was nothing that, other than as the

1    government states, the testimony of these individuals who were

2    caught illegally, that they identified a person who was a

3    contact in their phone.  Again, that all took place in Canada.

4         I am questioning whether or not there is actual

5    jurisdiction or established jurisdiction, and anything that

6    says so in this Circuit that has established that there is

7    jurisdiction to bring this here.

8         THE COURT:  Counsel, approach.

9         (Discussion held off the record.)

10         THE COURT:  The Court will overrule Ms. Brazile's

11    objection to establishing proper venue in view of the

12    conversation we had at the bench with regard -- may I say this

13    on the record -- with regard to your intention should an

14    indictment --

15         MS. BRAZILE:  Should there be an indictment, your

16    Honor, I will raise that issue again.

17         THE COURT:  Thank you.

18         With regard to the issue of probable cause, this

19    Court has taken copious notes of the arguments presented by

20    both sides.  The Court has reviewed Exhibits 1 through 5, as

21    well as the charging document.  The Court is prepared to rule.

22         Based on the evidence presented, based on the

23    arguments made, and based on the charging documents and the

24    exhibits that have been offered to the Court in support of

25    the government's argument, the Court does find that there

1  is probable cause that the crime charged in this case under

2  8 U.S.C. Section 1324(a)(1)(A)(4) has been committed and that

3  it is the defendant in this case, Juan Antonio Garcia-Jimenez,

4  who has committed this crime.

5       The elements of the crime have been satisfied, in the

6  Court's view, and that the crime was committed and that the

7  crime was committed by this defendant.  The Court finds

8  probable cause on both counts.

9       MR. McDONALD:  Thank you, your Honor.

10      MS. BRAZILE:  I don't think there is anything further

11 from the defendant, your Honor.  From what I understand, any

12 future charges will be forthcoming.

13      THE COURT:  Very well.

14      MR. McDONALD:  Nothing further from the government.

15 Thank you.

16          (Proceedings concluded at 2:03 p.m.)

17                  *       *       *

18

19              CERTIFICATE OF TRANSCRIBER

20

21     I certify that the foregoing is a correct transcription

22 from the official electronic sound recording of the proceedings

23 in the above-entitled matter.

24
        s/ Rene L. Twedt                October 29, 2018
25 RENE L. TWEDT, CSR-2907, RDR, CRR, CRC    Date
        Federal Official Court Reporter